# Staunton

THE YELLOW CAB CORPORATION OF ABINGDON, VIRGINIA v. PAULINE HENDERSON.

September 10, 1941.

Record No. 2396.

Present, Campbell, C. J., and Holt, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*T. L. Hutton, George M. Warren* and *H. E. Widener,* for the plaintiff in error.

*William A. Stuart* and *Fred C. Parks,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Pauline Henderson instituted this action by notice of motion against the Yellow Cab Corporation of Abingdon, Virginia, to recover for personal injuries she sustained by reason of being struck by a taxicab owned by that corporation and driven by its employee, Jerry Price. The jury returned a verdict in favor of Mrs. Henderson in the sum of $15,000, and the trial court entered final judgment thereon. The parties will sometimes be referred to herein as they appeared in the trial court.

The defendant seeks to have the judgment reversed on the grounds that the trial court erred in refusing to strike the evidence of the plaintiff; in granting instructions under the doctrine of the last clear chance; in refusing instructions; and in refusing to set aside the verdict of the jury as contrary to the law and the evidence.

The evidence in the case is in little conflict as to material matters except as to the speed of the defendant's car and the presence of an approaching automobile, at the scene of the accident, with lights so bright as to prevent the driver of the taxicab from seeing the peril of the plaintiff. Stated in the light most favorable to the plaintiff, in view of the jury's verdict, it is as follows:

The accident occurred about 9:30 on Saturday night, October 7, 1939, on Main street, in the town of Abingdon, Virginia. Main street is a paved highway, a main artery of traffic constituting a part of the Lee Highway, and is forty feet wide from curb to curb. It runs east and west and is straight and level for a considerable distance in both directions.

On the night in question, Mrs. Henderson left her residence on the south side of the street for the purpose of going to the gasoline service station of the Virginia

Motor Company, located across the street, a short distance west of her home. She intended to go to the front door of the station to telephone her husband who was operating a restaurant in the west end of the town. This door of the station is located behind some gasoline pumps, and to reach it she had to go around the western end of the pumps. She was proceeding diagonally across the street and had reached a point seven feet from the north curb line when she was struck by the taxicab.

The section of the street where she crossed was brightly lighted. One street light was one hundred and eleven feet east of the point where she was struck and one was two hundred and fourteen feet west. The place of the impact was immediately in front of a canopy of the Virginia Motor Company. The illumination of that point, in addition to the lights of the taxicab itself, consisted of light furnished by a neon tubing around the canopy, a Dodge sign over the center of the canopy, and two two-hundred-watt light bulbs. The weather was fair, and the pavement was dry.

There were no automobiles parked on the street in the vicinity of the accident. The speed limit of the traffic laws of the town of Abingdon, in force at the time and place of the accident, was twenty-five miles per hour.

The Virginia Motor Company has a paved driveway from the street in front of its service station for a distance of one hundred and ten feet along the north curb line. The curbing has been removed for that distance.

The plaintiff testified that when she left her home, she went west along the sidewalk on the south side of Main street to a corner where there was an alley-way running to the south; that no car passed either towards the east or west immediately before she started across the street; that she looked to her right and to her left before leaving the sidewalk and saw no car coming from either direction; that as she walked across the street, "there wasn't anything coming from the west;" that she did not remember whether she looked continually for ve-

hicles after she got into the street; that she did not, at any time, see the car which hit her; and that she was in no hurry to cross the street and was proceeding at "just a regular walk."

In explanation of her failure to see the taxicab when she looked east, at the time of crossing the street, she said: "Well, he was coming so far up the street that I didn't see it, I guess."

At the scene of the accident there is a clear, unobstructed view east for about one thousand feet and a view west from three to four hundred feet. With the illumination existing at the time of the accident, a pedestrian, at the place of the collision, could be seen for a distance of "at least one hundred steps."

E. R. Craig, the owner of the Virginia Motor Company, testified that as he was about to check his oil pumps and close his business for the night, he saw the plaintiff walking across the street at an angle and, at the same time, out of the corner of his eye, saw the taxicab coming down the street. Mrs. Henderson was walking in a natural position at a moderate gait towards the northwest. She had passed the center of the street and was about ten feet from the northern curb line. She was looking in the direction she was walking. The taxicab was then within twenty feet of her. He said, "I did see that Mrs. Henderson was going to be struck" and "I didn't have time to give any warning." He estimated the speed of the cab at from thirty-five to forty-five miles per hour—perhaps, closer to forty miles. He thought she would have gotten clear of the car had she been able to take three to four more steps towards the north. He could not positively state whether another automobile passed along the street from the west about that time.

The plaintiff was struck by the right front of the taxicab with such force that her body "went through the air before it struck the pavement," and then rolled on the pavement for several times before coming to rest at a point sixty feet from the point of impact. The brakes

of the taxicab were not applied until after the accident. The cab ran fifty-three feet after the collision.

Mrs. Henderson was gravely and permanently injured. She suffered multiple fractures of the pelvis, multiple comminuted fractures of the right leg, comminuted fractures of the left leg, and numerous other injuries. She remained unconscious for two weeks. One of the medical witnesses said she was torn all to pieces and he did not see "how anyone could live through it." The nature and extent of her injuries are such that it is not contended that the amount of the judgment is excessive.

The cab's right fender, the right side of the hood, and the radiator grill were bent and the right headlight broken.

The noise of the impact was so great that a witness, who was close by but did not see the accident, stated, regarding the noise of the crash, "My first thought was, there was two cars ran together." He immediately turned in the direction of the street, and he saw no other car passing in either direction.

Jerry Price, the driver of the cab, said that he had taken up a passenger, Ray Marshall, at the cab station on Main street, in the eastern end of Abingdon. He then drove to Main street, turned left thereon and started west. He stated that as he was driving about twenty miles an hour, he met a car next to the Virginia Motor Company, approaching from the west on its side of the road; that he did not know the speed of this car, but its lights were the brightest he had ever seen; that his own lights were dimmed; and that he could not see the street for a few seconds.

According to his evidence, the other car passed him at or immediately before the moment he struck the plaintiff. Said he, "Just as I got to the car, just at the time, a woman ran right out in front of me, just happened all at once. I don't know where she come from." Later he said, "I can't say she was running," and "just seen a glimpse as I hit her." He admitted that if she had passed in front of the oncoming car, he could have seen her by its headlights.

For the purpose of attacking his veracity, it was testified that he told the chief of police of Abingdon immediately after the accident that he did not see Mrs. Henderson until he struck her and she was rolling off the side of his car. In effect, he admitted that he did not know where she came from, and that he did not see her before the collision. He said he was frightened because of the collision, and while he took his foot off the accelerator when the lights blinded him, he did not apply the brakes nor sound his horn.

The passenger in the taxicab undertook to corroborate the testimony of the driver as to meeting a car with bright lights. He said he did not see Mrs. Henderson until after she had been hit; that Price was making twenty or twenty-five miles an hour he ''reckoned;'' and that the car they met was running at about the same speed.

Credible witnesses testified that the passenger was so drunk and intoxicated that he was incapable of knowing what had happened. He remained quietly inside the cab for an hour after the accident before going home.

The defendant contends that the plaintiff was guilty of such contributory and concurring negligence as bars her right of recovery. It further contends that the driver of its vehicle was so blinded by the lights of an approaching automobile that he was unable, in the exercise of reasonable care, to observe the presence of Mrs. Henderson in the street before she was struck.

The principal issue for our consideration is the sufficiency of the evidence and circumstances to justify the application of the doctrine of the last clear chance. The assignments of error are so related that they will be considered together in passing upon that issue. The principles of the doctrine of the last clear chance have been so often stated and restated by this court that we hesitate to make an extended discussion of them. 7 Michie's Digest, Va. and W. Va. Rep., Negligence, section 29 (a) and numerous cases there cited.

As Mr. Justice Hudgins states: "This doctrine is precisely what the name implies—that is, that one of the litigants had a last clear chance to avoid inflicting the damage or injury, notwithstanding the fact that the other litigant had previously placed himself or his property in a position of peril." *Virginia Electric & Power Co. v. Whitehurst,* 175 Va. 339, 8 S. E. (2d) 296.

█ The doctrine, we think, has nowhere been better stated than by Mr. Justice Holt, in the very recent case of *Joynes* v. *Coard,* 175 Va. 571, 9 S. E. (2d) 454, 455:

"Whenever one sees another in a place of peril from which it appears that he can not extricate himself or where it appears that he is unconscious of his danger, or whenever by the exercise of ordinary care the defendant should have been cognizant of the situation and has a clear chance to avoid an accident with safety to himself, he must take that chance. In short, he is charged with what he saw and with what he should have seen. The antecedent negligence of a plaintiff does not of itself preclude his recovery. Starkly stated, the reason for the rule is this: One can not kill another merely because he is negligent."

█ █ The doctrine presupposes that there has been negligence on the part of both the plaintiff and the defendant. It has no application here unless there is evidence that the plaintiff has been guilty of contributory negligence. Though a person be guilty of negligence, this does not relieve another from avoiding injury to him if there is an opportunity for the other to avoid it up to the moment the hurt is occasioned. *Barnes* v. *Ashworth,* 154 Va. 218, 153 S. E. 711; *Joynes* v. *Coard, supra.*

█ It is distinguished from concurring negligence by the fact that in the last·clear chance, one litigant discovers, or by the exercise of ordinary care should have discovered, the peril of the other litigant and, therefore, has the opportunity of avoiding the injury but fails to do so. In such a situation, the negligence of the plain-

tiff may become the remote cause and that of the defendant the proximate cause. *Crawford* v. *Hite*, 176 Va. 69, 10 S. E. (2d) 561; *Parker* v. *Norfolk Orange Crush Bottling Co.*, 175 Va. 249, 8 S. E. (2d) 301.

The mere violation of a statute does not necessarily establish the existence of proximate cause. *Perkinson* v. *Persons*, 164 Va. 172, 178 S. E. 682; *Gregory* v. *Daniel*, 173 Va. 442, 4 S. E. (2d) 786.

As we have repeatedly stated, the test in a case where the defendant is required by law to keep a proper lookout "is not whether he actually saw the plaintiff in time to have saved him, but whether he could have seen him in time to have avoided the injury, by exercising ordinary care, and failed to do so." *Bennett* v. *Spencer*, 167 Va. 268, 189 S. E. 169; *Perkinson* v. *Persons, supra; Dobson-Peacock* v. *Curtis*, 166 Va. 550, 186 S. E. 13.

One who drives faster than he should drive into a cloud of dust, in a snow storm, or in the face of blinding headlights, is required under such circumstances, in the exercise of ordinary care, to increase his diligence to avoid injury to anyone who may be on the highway in front of him. *Clarke* v. *Parker*, 161 Va. 480, 171 S. E. 600; *Joynes* v. *Coard, supra.*

In *Keeler* v. *Baumgardner*, 161 Va. 507, 171 S. E. 592, and *Perkinson* v. *Persons, supra*, judgments against defendants were sustained, although the respective plaintiffs were negligently crossing streets diagonally between intersections, because there was sufficient evidence to indicate that the drivers of the automobiles which struck the plaintiffs should have seen them, in the exercise of ordinary care, in time to have avoided injury to them.

In the first of the above two cases, neither the plaintiff nor the defendant saw each other until the moment of impact. In the second case, the plaintiff became conscious of her peril too late to avoid injury. The facts in the two cases, while not exactly similar to those here,

are analogous. The principles applied are applicable to the instant case.

The testimony of Price was uncertain, confusing and self-contradictory in many respects. He was not corroborated as to meeting any car with blinding lights, except by the testimony of his intoxicated passenger. His account of the presence of the eastbound car at the scene of the accident was not only in conflict with other evidence but in conflict with certain physical facts.

There is no question of the place where the plaintiff was struck. It was immediately in front of the Virginia Motor Company. According to Price, the point of impact and the place where the blinding car passed him were practically the same. If the two cars were, each running at twenty-one miles an hour, they were traveling seven times as fast as the plaintiff; at forty miles, thirteen times as fast. It was impossible for Mrs. Henderson, at the speed she was walking, to leave the sidewalk, pass behind an eastbound car, and reach the point of impact at the same moment the two cars met and passed each other at that point. When Mrs. Henderson was thirty-three feet from the point of impact, the taxicab was much farther distant and the east bound car was increasing its distance therefrom. Under these conditions, the taxicab would have met and passed such an oncoming car a considerable distance east of the point of collision. The plaintiff could not have stepped suddenly from behind a passing car.

The jury could have found that Price was exceeding the speed limit both from the direct evidence and from the circumstances attending the accident; that he did not keep a proper lookout; that there was no approaching car; and that if he had been exercising due care, he would have seen the plaintiff in his path in time to have avoided striking her.

It is assumed that the driver of the taxicab would not have driven upon the plaintiff if he had seen her. The jury, by their verdict, having found that he was not

blinded by the lights of an approaching car, he should have seen her. If he had, he would have discovered that she was not looking at the taxicab, and that if it continued on its course it would strike her. That placed upon him the obligation to stop his car, to turn it to the right or the left, and attempt to save her from injury.

It was a question for the jury to determine, under the facts and circumstances, whether Price did have such a last clear chance to avoid the collision.

Thirty instructions were asked for, seven by the plaintiff and twenty-three by the defendant. The court gave five of those asked for by the plaintiff and five of those requested by the defendant. In addition, the court, of its own volition, gave a full and complete instruction, relating to the respective duties and obligations of the plaintiff and defendant, which set out the controlling principles of the doctrine of the last clear chance as applied to the facts of the case. The instruction drawn by the court was favorable to the defendant. It set out in detail the theory of its defense. No real objections were raised against it by either party.

The theories of the case relied upon by each of the parties were fully and completely covered in the instruction given.. The instructions refused were properly rejected because either they were covered by the instructions given or were in conflict therewith.

We regret the necessity to reiterate that the object of instructions is to enlighten the minds of the jurors on the law of the particular case, and when that object has been fully accomplished, the multiplication of instructions tends to confuse the jury and is a practice to be avoided. *Henderson* v. *Foster,* 139 Va. 543, 124 S. E. 463.

The able and learned trial judge is to be commended for his diligent effort, under difficult circumstances, to submit the issue to the jury in precise, clear, and unmistakable language.

The defendant cites numerous cases in support of his contention that the doctrine of the last clear chance is not applicable here. Among these cases are *Meade* v. *Saunders,* 151 Va. 636, 144 S. E. 711; *Stephen Putney Shoe Co.* v. *Ormsby's Adm'r,* 129 Va. 297, 105 S. E. 563; *Green* v. *Ruffin,* 141 Va. 628, 125 S. E. 742, 127 S. E. 486, each of which is distinguished upon the facts from this cause by Mr Justice Browning in *Bennett* v. *Spencer, supra.*

In *Frazier* v. *Stout,* 165 Va. 68, 181 S. E. 377, the injured pedestrian plaintiff was looking at the approaching car from the time she left the side of the road until she stepped in its path.

In *South Hill Motor Co.* v. *Gordon,* 172 Va. 193, 200 S. E. 637, a drunken plaintiff, walking on the highway, saw an approaching car a distance of four hundred yards away but made no effort to save himself by stepping off the highway. In addition, there was nothing to show that the driver of the oncoming car, under the conditions existing, either saw the pedestrian or could have seen him in time to have avoided striking him.

Cases involving injuries to pedestrians on railway tracks are frequently distinguished from those arising from automobile accidents on the highways because of different conditions in the nature, field, and extent of the operation of railway trains and automobiles. *Hawkins* v. *Brickhouse,* 172 Va. 1, 199 S. E. 482.

There is no need for a more extended review of the cases since most of them merely involve the application of admitted principles to the facts of each particular case. The contradictions, alleged to exist in them, arise many times from the endless variety in which different minds regard the details and interpret the facts and circumstances, or from the failure of the courts to state precisely the principles they apply.

Seventeen days after the verdict and while a motion to set it aside, upon the grounds hereinbefore discussed, was pending, the defendant discovered that one of the

jurors, John G. Woodward, who sat in the trial, was the nephew of the great grandmother of the plaintiff's husband, Tom Henderson. The fact of this relationship by affinity was made an added ground for a new trial. Except for the relationship no prejudice was alleged.

The record shows that when the panel of prospective jurors were asked upon their *voir dire* if they were related by blood or marriage to either of the parties, none of them responded in the affirmative.

In an affidavit by the juror, he declared that he did not know the plaintiff or her husband, nor of any relationship to them, when he was examined on his *voir dire;* that on the second day of the trial, he saw in the courtroom Charlie Henderson, who he knew "was some little kin to me by my mother;" that he later saw Charlie Henderson talking to a man, who, he later discovered, was Tom Henderson, and seeing them in conversation, he thought that they might be related but was not certain what the relationship between them was; that there were a lot of Hendersons in the county not related to him; that when he thought about Tom possibly being related to Charlie, he thought of it as "something that was very far off and nothing that could be called close kin;" that he was not influenced in any way by the passing thought that Tom and Charlie might be related; that he felt that he acted as a fair and impartial juror; that when the jury began to consider their verdict, everyone of its members voted in favor of a recovery by the plaintiff; that as to the amount of recovery, he had originally proposed a smaller sum than some of his fellow-jurors; and that he had never seen Pauline Henderson before the trial started and had never heard of her.

Tom Henderson also filed an affidavit, in which he stated that he had never seen Woodward before the trial and did not know that he was any relation until afterwards.

The juror's statement was not contradicted in any particular. It positively negatives any favor towards the

plaintiff or any prejudice against the defendant. It shows him to have been unmindful of any relationship to the plaintiff or her husband.

It is too late after a verdict to object to the competency of a juror except upon the ground of prejudice. By Virginia Code 1936, section 6002, it is provided:

"No irregularity * * * in the drawing, summoning, returning or impanelling of jurors shall be sufficient to set aside a verdict unless the party making the objection was injured by the irregularity or unless the objection specifically pointing out such irregularity was made before the swearing of the jury; * * * ."

Neither the sole fact of irregularity nor the mere suspicion of prejudice based upon the irregularity is sufficient. Some injury must be shown to result from the irregularity. Here the evidence shows no indication of prejudice affecting the defendant. Mere suspicion or possible inferences cannot be allowed to overrule the orderly administration of justice, for otherwise there would be continued delays and many proper verdicts set aside. The importance of avoiding another trial, if the first trial was fair, is of paramount importance.

In *Doyle* v. *Commonwealth,* 100 Va. 808, 40 S. E. 925, a motion for a new trial was made after a verdict, upon the ground of the disqualification of a juror. On this point, Keith, P., after reviewing a number of cases, said:

"It appears from these authorities that in cases where the cause of challenge is unknown at the time the juror is elected and sworn, and which could not have been discovered by the exercise of ordinary diligence, it will not be sufficient ground for a new trial unless it is made to appear that the parties suffered injuries from the fact that such juror served in the trial of the case."

"The objection that a juror is not competent because of some personal incapacity comes too late after a verdict and conviction, and is not good ground for setting the verdict aside and granting a new trial." *Thurman* v. *Commonwealth,* 107 Va. 912, 60 S. E. 99.

See also, *Simmons* v. *McConnell,* 86 Va. 494, 10 S. E. 838, and cases cited.

 The rules applicable to the qualification of a juror in a criminal case are the same as those applying in a civil case. *Temple* v. *Moses,* 175 Va. 320, 8 S. E. (2d) 262.

 The statute and the foregoing cases dispose of the contention of the defendant. The trial court, in the exercise of sound discretion, did not err in overruling the motion for a new trial based upon the ground of the juror's incompetency.

In this case, the trial court, after a patient hearing of all the evidence, after observing the witnesses and jurors, and after carefully and properly instructing the jury as to the law, expressed its satisfaction that a correct verdict had been rendered, and that no injustice had been done to the defendant. There is evidence to support the judgment. It is not plainly wrong in principle, and there is no evidence to show partiality or prejudice in the jury. We are of opinion, therefore, to affirm the judgment of the trial court in all respects.

*Affirmed.*